

**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Robert S. Siegal, | * | Case No. 17-15088-MMH |
| | * | |
| Debtor. | * | Chapter 13 |
| | * | |
| * * * * * * | * | * * * * * * |
| | * | |
| Robert S. Siegal, | * | |
| | * | |
| Plaintiff, | * | Adversary No. 17-00348-MMH |
| v. | * | |
| | * | |
| Lawrence R. Everett, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| * * * * * * | * | * * * * * * |

### <u>MEMORANDUM OPINION</u>

This adversary proceeding involves a failed business relationship. Robert Siegal and

Lawrence Everett formed a business entity known as Farm Fresh Direct by A Cut Above, LLC

("Farm Fresh" and collectively with Mr. Everett, the "Defendants"). At some point subsequent to

the filing of Mr. Siegal's chapter 13 case, the Defendants sought to sever their business

relationship with Mr. Siegal by, among other things, attempting to buy out Mr. Siegal's

membership interest in, and terminating his employment with, Farm Fresh. The Defendants

assert that the Farm Fresh Operating Agreement and applicable state law authorized these and other actions. Mr. Siegal counters that the Defendants' conduct violated sections 362 and 525 of the U.S. Bankruptcy Code.[1] 11 U.S.C. §§ 362, 525. Indeed, the parties' dispute raises issues at the intersection of federal bankruptcy law and state entity law, and the important public policies underlying each.

A party's nonbankruptcy law rights, including those under state law, generally are respected to the greatest extent possible in a bankruptcy case. Where a party's state law rights conflict with a provision or policy underlying the Code, courts are guided by the provisions of the Code, the Bankruptcy and Supremacy Clauses of the U.S. Constitution, and relevant case law. For example, the U.S. Supreme Court has instructed that "[p]roperty interests are created and defined by state law. *Unless some federal interest requires a different result*, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979) (emphasis added). As such, the statement that a party's conduct was permissible under state law may, but does not necessarily, end the inquiry. The consequences of that statement depend on the particular facts and circumstances of the case at hand.

As further explained below, many of the Defendants' actions appear grounded in the terms of the Farm Fresh Operating Agreement and applicable state law. The Defendants cannot, however, use the Operating Agreement as a shield with respect to conduct that otherwise would violate the automatic stay of section 362 of the Code—one of the hallmark protections provided to debtors under the Code. 11 U.S.C. § 362(a). Rather, the Court must analyze the alleged conduct and its consequences under the Code. The Court does, however, agree with the Defendants that certain of the alleged conduct implicates the automatic stay only if Mr. Siegal is

---

[1] 11 U.S.C. §§ 101, et seq. (the "Code") (West 2017).

a member of Farm Fresh and that membership interest is protected by the Code. Although the Court does not, by this Memorandum Opinion, determine the validity or extent of Mr. Siegal's membership interest in Farm Fresh, the Court rejects the Defendants' position that Mr. Siegal's failure to contribute $100.00 to the entity forecloses any argument that Mr. Siegal is a member. Accordingly, for the reasons set forth below, the Court will grant the Defendants' motions for summary judgment solely with respect to the Defendants' response to Mr. Siegal's demand to inspect records and the Defendants' alleged use of Mr. Siegal's proprietary information without compensation. The Court will deny the Defendants' summary judgment motions on all other claims and will likewise deny Mr. Siegal's motion for summary judgment.

## I.    Relevant Background[2]

On April 17, 2017, Mr. Siegal filed a petition for relief under chapter 13 of the Code. Prior to the petition date, Mr. Siegal and Mr. Everett entered into a business venture to operate Farm Fresh, a home food delivery business. The general terms of that business venture are set forth in the Farm Fresh Operating Agreement, dated December 23, 2016 (the "Operating Agreement"). Under the Operating Agreement, Mr. Siegal and Mr. Everett were to become 50-50 members of Farm Fresh. In addition, in anticipation of forming Farm Fresh, Mr. Siegal and Mr. Everett executed a Non-Disclosure Agreement, dated October 3, 2016, with respect to certain proprietary information of Mr. Siegal (the "Non-Disclosure Agreement").

After the petition date, Mr. Everett and Farm Fresh attempted to buy out Mr. Siegal's membership interest in Farm Fresh for $100.00, by delivering a Buyout Notice.[3] Mr. Siegal and

---

[2] The facts set forth in this Part I are based on the relevant documents and the Court's docket. The Court determines that these particular facts are undisputed.

[3] Mr. Siegal has asserted that the issuance of the Buyout Notice was a violation of the automatic stay in this chapter 13 case. After holding a hearing on November 30, 2017 (the "November Hearing"), Judge Rice granted Mr. Siegal's motion for partial summary judgment on that basis, as set forth in the December Stay Order (as that term is defined below).

Mr. Everett also entered into an Employment Agreement, dated May 5, 2017 (the "Employment Agreement"). The Employment Agreement contemplated Mr. Siegal's continued employment as an at-will employee, but introduced a covenant not to compete into the employment relationship. The Defendants terminated Mr. Siegal's employment on June 14, 2017.

The parties have filed a variety of pleadings against one another in both this adversary proceeding and the main chapter 13 case. For example, the Defendants have objected to Mr. Siegal's proposed chapter 13 plan, and that objection and plan confirmation remain pending. The Defendants also filed a motion to dismiss the Amended Complaint in this adversary proceeding [ECF 94] and a motion to dismiss Mr. Siegal's chapter 13 case [ECF 63 in Case No. 17-15088]. The Court held separate hearings on each motion to dismiss on April 10, 2018, and July 10, 2018, respectively. The Court analyzed the motion to dismiss in this adversary proceeding as a motion for judgment on the pleadings and entered an Order granting in part, and denying in part, that motion (the "Rule 12(c) Order"). ECF 119. The Court also entered an Order denying the motion to dismiss Mr. Siegal's chapter 13 case without prejudice. ECF 78, Case No. 17-15088.

The matters now before the Court involve four separate motions for partial summary judgment—three filed by the Defendants and one filed by Mr. Siegal (collectively, the "Dispositive Motions"). ECF 78, 87, 115, 127. The parties have opposed each other's motions and filed supplemental briefing in support of their respective positions. The Court held hearings on the Dispositive Motions on June 5, 2018 (the "June Hearing") and July 19, 2018. The matters are now fully briefed and ripe for resolution. Notably, in addition to the pending Dispositive Motions, Mr. Siegal previously filed a motion for partial summary judgment in this adversary

proceeding, which Judge Rice granted by an Order entered on December 4, 2017 (the "December Stay Order").[4] ECF 33.

## II.    Jurisdiction and Legal Standards

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This proceeding is a "core proceeding" under 28 U.S.C. § 157(b)(2).

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7056, governs the Dispositive Motions. A moving party may be entitled to judgment as a matter of law under Civil Rule 56 in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). *See also Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing standards for summary judgment). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett*, 532 F.3d at 297. Courts generally will grant summary judgment "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Stanley Martin Cos. v. Universal Forest Prods. Schoffner LLC*, 396 F. Supp. 2d 606, 614 (D. Md. 2005) (citations omitted).

A court must view the evidence on summary judgment in the light most favorable to the nonmoving party and "draw all justifiable inferences" in its favor, "including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (citations omitted). Under Civil Rule 56, a party may

---

[4] Judge Rice recused himself from this adversary proceeding by Order dated January 29, 2018. ECF 69. Nothing in this Memorandum Opinion affects the findings or holding of Judge Rice in the December Stay Order.

support assertions made in a motion for summary judgment by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. Fed. R. Civ. P. 56(c). A court has some flexibility in the kinds of evidence that it can consider in resolving a motion for summary judgment. *See, e.g., Humphreys & Partners Architects*, 790 F.3d 532, 538–539 (4th Cir. 2015).

In these matters, the Defendants rely on, among other things, the Operating Agreement, the Employment Agreement, the Non-Disclosure Agreement, and the Declarations of the Defendants' counsel and Mr. Everett. Mr. Siegal points to the facts stated in the pleadings, as well as his Declaration (the "Siegal Declaration") [ECF 133], which the Court permitted Mr. Siegal to file after the June Hearing under Civil Rule 56(e). June Hearing Tr. 24. *See also, e.g.,* Fed. R. Civ. P. 56(e); *Martin v. Int'l Longshoremen's Ass'n, Local 1248*, No. 2:17CV175, 2017 WL 5146018, at *7 (E.D. Va. Aug. 16, 2017) ("Whether to afford a party who fails to properly support an assertion of fact or fails to properly address another party's assertion of fact an opportunity to properly support or address the fact lies within the sound discretion of the Court."). The Defendants, in turn, filed a motion to strike Mr. Siegal's Declaration.[5] ECF 137. The Court considers only the aspects of the evidence and the parties' respective Declarations that otherwise would be admissible under the Federal Rules of Evidence. The Court has reviewed and considered all of the relevant, admissible evidence. Where relevant or instructive, the Court below highlights the evidence it found particularly pertinent to the issues raised by the Dispositive Motions.

---

[5] As noted herein, the Court relies only on statements in the Siegal Declaration that the Court has determined, after careful review, would be admissible under the Federal Rules of Evidence. Accordingly, the Court will deny as moot by separate Order the Defendants' motion to strike.

### III.    Analysis

The Amended Complaint includes multiple claims against the Defendants situated within two Counts. Count I is titled "Rectifying the Unauthorized, Postpetition Transfer of Estate Property" and asserts that the Defendants' postpetition conduct violated both sections 362 and 525 of the Code. Am. Compl. at 7–8, ECF 42. That Count seeks enforcement of sections 362 and 525 of the Code and requests appropriate damages. *Id*. Count II is titled "Declaratory Relief to Remedy Defendants' Wrongful Conduct" and alleges, among other things, that "the Defendants forced [Mr. Siegal] under duress to sign the Employment Agreement." *Id.* at 9. That Count requests a declaratory judgment that the Employment Agreement is unenforceable. *Id.*

By the Dispositive Motions, the Defendants seek summary judgment on the following aspects of Count I: (i) Mr. Siegal is not a member of Farm Fresh because he did not contribute the $100.00 consideration required by the Operating Agreement; (ii) the Defendants' request that Mr. Siegal pay the costs associated with his records inspection request did not violate the automatic stay; (iii) the Defendants' threats to withhold Mr. Siegal's pay did not occur or violate the automatic stay; (iv) the Defendants' use, if any, of Mr. Siegal's proprietary information without compensation did not violate the automatic stay; (v) Mr. Everett is not subject to liability for any violations of the automatic stay because of an exculpation clause in the Operating Agreement; and (vi) Farm Fresh's termination of Mr. Siegal did not violate section 525(b) of the Code.[6] ECF 78, 87, 115. Mr. Siegal's Dispositive Motion is more a defense to the Defendants' position regarding the status of Mr. Siegal's membership interest in Farm Fresh than a request for affirmative relief. ECF 127. Regardless, the Court will dispose of that motion by this Memorandum Opinion in that the issue concerning whether Mr. Siegal is a member of Farm

---

[6] Certain of the relief requested by the Defendants' Dispositive Motions was resolved by the Rule 12(c) Order.

Fresh will be resolved only after an evidentiary trial before the Court. The Dispositive Motions do not address Count II of the Amended Complaint.

### A.  Mr. Siegal's Member Status

Mr. Siegal and Mr. Everett both acknowledge that they intended to become 50-50 members in the limited liability company ("LLC") known as Farm Fresh. Non-Disclosure Agreement at 1; Everett Declaration at ¶ 20, ECF 123; Siegal Declaration at ¶ 25, ECF 133.[7] The record suggests that the two men treated each other as members at all times prior to December 2017, when the Defendants apparently first discovered that Mr. Siegal did not contribute $100.00 to Farm Fresh.[8] *See* Defendants' Answer and Counterclaim at ¶ 9, ECF 7 (admitting that "Debtor and Defendant Everett each became fifty percent (50%) members of Farm Fresh LLC"); Defendants' Response in Opposition to Motion for Partial Summary Judgment at 1, ECF 19 (stating that Farm Fresh does not dispute that Debtor retains a 50% ownership interest in Farm Fresh); Email of Nov. 8, 2017, Monopolis Declaration, Ex. E, ECF 125 (requesting confirmation that, as is required for members of Farm Fresh, "Mr. Siegal will reimburse Farm Fresh for all costs and expenses incurred by Farm Fresh in connection with his inspection and copying of Farm Fresh's books and records as set forth in Section 8.1.2 of the Operating Agreement in accordance with § 4A-406(c) of the LLC Act"); and the Defendants' Answers to the Amended Complaint, ECF 49, 50 (filed on January 10, 2018, and denying that Mr. Siegal and Mr. Everett were ever partners and each stating that they lack sufficient knowledge or information to admit or deny that Mr. Siegal and Mr. Everett each became fifty percent members of Farm Fresh). The Defendants argue that such payment is a condition precedent to receiving a membership interest

---

[7] The Court cites this paragraph of the Siegal Declaration solely for purposes of the statement regarding Mr. Siegal's belief that he is a 50% owner of Farm Fresh.

[8] At the June Hearing, Mr. Monopolis stated that he had learned Mr. Siegal did not pay the required $100.00 on the morning of the November Hearing. June Hearing Tr. 84–85, ECF 131.

in the LLC. Since December 2017, the Defendants have consistently argued that Mr. Siegal never became a member of Farm Fresh and that, accordingly, his claims against the Defendants are without merit under the Operating Agreement and applicable law.

The Court has reviewed the Operating Agreement in its entirety. The Operating Agreement appears to require a contribution of $100.00 by each Mr. Siegal and Mr. Everett. *See* Operating Agreement, Ex. A. The Operating Agreement also, however, acknowledges satisfaction of that condition precedent. Specifically, it provides that "[t]he parties hereto acknowledge and agree that each Member contributed or caused to be contributed to the Company the respective initial Capital Contributions set forth on **Exhibit A** attached hereto by transferring to the Company the assets set forth on **Exhibit A-1** attached hereto." *Id.* at § 3.1.1. Exhibit A to the Operating Agreement, in turn, lists each Mr. Siegal and Mr. Everett and indicates $100.00 in their respective capital accounts. *Id.* at Ex. A.

The language of section 3.1.1 of the Operating Agreement arguably is ambiguous. It does not clearly articulate the capital contribution as a condition precedent to membership. It likewise does not indicate within its four corners whether the $100.00 contribution was intended as a nominal recitation of consideration, whether the parties intended to be bound upon the acknowledgement of payment in section 3.1.1 upon executing the agreement, or whether the contribution could be satisfied through $100.00 in value rather than cash. Regardless, the parties' conduct both prior to, and after, the execution of the Operating Agreement suggests that section 3.1.1 was viewed, at least initially, by the parties as a technical requirement of nominal consideration that both deemed satisfied.

To counter the parties' conduct, the Defendants' rely heavily on judicial admissions by Mr. Siegal in his Answer [ECF 72] to the counterclaims filed by the Defendants against him in

January 2018 [ECF 49, 50]. In that Answer, Mr. Siegal admitted the following two allegations in the Defendants' Cross-Complaint:

> 5. On or about December 23, 2016, the Debtor and Everett entered into an agreement (the "Operating Agreement") pursuant to which each would, upon payment of an initial $100 contribution, become a 50% member of Farm Fresh.

> 6. The Debtor never paid the required, initial $100 contribution and thus never became a member of Farm Fresh.

Mr. Siegal subsequently filed an Amended Answer [ECF 89] and Motion to file Amended Answer out of time [ECF 91], which the Court considered on the pleadings, after discussing the matter with the parties during a telephonic status hearing on March 7, 2018. ECF 117. The Court granted Mr. Siegal's Motion to File Amended Answer by an Order entered on March 9, 2018. ECF 100. As that Order explained, the Court based its ruling on Civil Rule 15(a) and a finding that the filing of the Amended Answer would not cause any prejudice or surprise to the Defendants. *Id. See also* Fed. R. Civ. P. 15(a).

Mr. Siegal's Amended Answer clarified his responses to the allegations in paragraphs 5 and 6 of the Defendants' Counter-Complaint. The Amended Answer reads, in relevant part:

> 5. Debtor admits the allegations in paragraph 5 of the Counterclaim as to the payment of $100, *and in further answering states that the absence of the $100 payment does not invalidate the Debtor's ownership interest in Farm Fresh*.

> 6. Debtor admits the allegations in paragraph 6 of the Counterclaim as to the payment of $100, and denies the conclusion that the Debtor never became a member of Farm Fresh, *and in further answering states that the absence of the $100 payment does not invalidate the Debtor's ownership interest in Farm Fresh*.

Amended Answer, at 1 (emphasis added). Based on the Amended Answer, Mr. Siegal is bound by the admission that the Operating Agreement required a contribution of $100.00 by each party seeking to be a member of Farm Fresh. *See, e.g., Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir. 1989) ("The general rule is that 'a party is bound by the admissions of his pleadings.'") (internal

citations omitted); *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.").[9] These judicial admissions preclude any arguments by Mr. Siegal that the Operating Agreement stated something different regarding conditions to membership. They do not, however, foreclose Mr. Siegal from arguing that he nevertheless became a member of Farm Fresh based on the parties' conduct or understanding of the agreement.[10] Accordingly, the Court finds that a genuine issue of material fact exists regarding Mr. Siegal's status as a member of Farm Fresh and will deny the Dispositive Motions to the extent they address this issue.

### B. Request for Inspection Rights

Prior to December 2017, Mr. Siegal exercised his right as a member under the Operating Agreement to request an inspection of the LLC's records. *See, e.g.,* Operating Agreement, § 8.2.1; Monopolis Declaration, Ex. D, ECF 125. The Defendants responded to this request, not by denying that Mr. Siegal was a member, but by asserting the right of Farm Fresh to receive

---

[9] The Court has considered the judicial admissions in the original Answer as compared to those included in the Amended Answer. The statements in the Amended Answer correspond to Mr. Siegal's consistent position in this adversary proceeding. The Court accordingly credits the statements in the Amended Answer. *See generally Pennsylvania Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F. Supp. 2d 819, 828 (E.D. Va. 2010) (discussing effect of decision to allow withdrawal or amendment of admission).

[10] Limited liability company operating agreements are governed by Maryland contract law. *See, e.g.*, *In re Solomons One, LLC*, No. 13-24475-TJC, 2013 WL 5934656, at *4 (Bankr. D. Md. Oct. 31, 2013) (explaining that "an LLC's operating agreement is interpreted in accordance with prevailing contract law"). Maryland courts, in turn, have recognized that the parties' conduct may amend or modify the written terms of a contract under certain circumstances. *See, e.g.*, *Kabba v. Ctr.*, No. PWG-17-211, 2017 WL 1508829, at *8 (D. Md. Apr. 27, 2017), *aff'd sub nom. Kabba v. Rent-A-Ctr., Inc.*, 730 F. App'x 141 (4th Cir. 2018) (explaining that "parties may modify their original agreement by their conduct 'notwithstanding a written agreement that any change to a contract must be in writing'") (internal citations omitted); *Kurz v. AMCP-1, LLC*, No. 1301, 2016 WL 547146, at *11 (Md. Ct. Spec. App. Feb. 10, 2016) ("Parties may, by their actions, orally waive a provision that requires changes to be made in writing."). In addition, the doctrine of estoppel may apply. *Cf. Grove v. Brown*, No. CV 6793-VCG, 2013 WL 4041495, at *6 (Del. Ch. Aug. 8, 2013) ("The conduct of the parties subsequent to Heartfelt's formation also confirms that both the Groves and the Browns believed that they were equal co-owners of Heartfelt."). These are not, however, matters to be resolved on summary judgment given the genuine issues of material fact.

reimbursement for the costs of any such production.[11] The Defendants argue that their conduct in connection with Mr. Siegal's records inspection request was proper and permitted by both the Operating Agreement and applicable state law.

> Section 8.1.2 of the Operating Agreement provides:

> The Company's books and records shall be maintained in accordance with United States generally accepted accounting principles and shall be available at the Company's principal office for examination by any Member or a Member's duly authorized representative at any and all reasonable times during normal business hours. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

Operating Agreement, § 8.2.1. In addition, the Maryland Limited Liability Company Act, which governs Farm Fresh and the Operating Agreement, permits LLCs to place reasonable conditions on members' inspection rights, "including standards governing what information and documents are to be furnished, at what time and location, and at whose expense." Md. Limited Liability Act, § 4A-406(c).

Mr. Siegal appears to frame the Defendants' request for reimbursement as an act to exercise control over, or interfere with, the debtor's (and the estate's) interest in the LLC in violation of the automatic stay of section 362(a) of the Code. 11 U.S.C. § 362(a). Section 362(a) prohibits, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). To the extent the Court determines that Mr. Siegal is a member of Farm Fresh, Mr. Siegal's

---

[11] The facts of this case are different from those involving the unilateral imposition of fees on a debtor by a non-debtor party under non-specific terms of a prepetition contract. *See, e.g.*, *In re Stark*, 242 B.R. 866, 872 (Bankr. W.D.N.C. 1999) (finding a stay violation where the court "conclude[d] that although the lender is free to 'ride-by' the residence of the debtors on a public street as it deems reasonable to 'view' the property it does not have the right under the contract to otherwise inspect the property without notice and has no authority to charge any type of fee for any type of bankruptcy 'inspections'"). In this case, Mr. Siegal initiated the discussions and was seeking to enforce a term of the parties' contract. That contract, in turn, specifically authorizes the costs being sought. A debtor generally does not get to pick and choose which contract provisions to enforce.

argument rests on characterizing the Defendants' request for reimbursement of expenses as an attempt to control or obtain possession of property of the estate.

The automatic stay is a core and critical component of the bankruptcy system. It "provides the debtor with a 'breathing spell' from the harassing actions of creditors, and it protects the interests of all creditors by preventing 'dismemberment' of the debtor's assets before the debtor can formulate a repayment plan or, in liquidation cases, the court can oversee equitable distribution of the debtor's assets." *In re Schwartz-Tallard*, 803 F.3d 1095, 1100 (9th Cir. 2015); *see also In re Pinkney*, No. 00-52385-C13W, 2002 WL 433151, at *3 (Bankr. N.D. N.C. Mar. 8, 2002). As such, courts scrutinize, and take seriously, alleged violations of the automatic stay.

The mere fact that the Defendants' conduct complied with the parties' private contract and applicable state law does not, standing alone, protect them from alleged automatic stay violations. Although Maryland, like many states, encourages freedom of contract in the business entity context, courts have refused to enforce contractual provisions that thwart important federal law policies. Thus, for example, prepetition contractual waivers of the automatic stay generally are disfavored and invalidated by courts in bankruptcy cases. *See, e.g.*, *In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship*, 216 B.R. 386, 389 (Bankr. D. Md. 1998), *supplemented*, 227 B.R. 422 (Bankr. D. Md. 1998) ("The courts have uniformly held that a waiver of the right to file a bankruptcy case is unenforceable."). Likewise, courts have scrutinized whether prepetition contractual restrictions on a debtor's ability to file bankruptcy are valid. *See, e.g.*, *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 209 (5th Cir. 2018), *as revised* (June 14, 2018) (holding that "federal bankruptcy law does not prevent a bona fide equity holder from exercising its voting rights to prevent the corporation from filing a voluntary bankruptcy petition just

13

because it also holds a debt owed by the corporation and owes no fiduciary duty to the corporation or its fellow shareholders."); *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265 n. 24 (Bankr. D. Del. 2016) (finding restriction invalid and collecting cases, including *Shady Grove Tech Center*, invalidating prepetition restrictions on a debtor's bankruptcy rights). Based on the facts at hand, however, the Court does not need to resolve whether contractual provisions restricting members' inspection rights are invalid on public policy grounds in bankruptcy cases.[12]

The undisputed facts in this matter show that the Defendants did not refuse or even demand a certain level of reimbursement before granting Mr. Siegal's record inspection request.[13] Rather, the evidence demonstrates that the Defendants were seeking reassurance that Mr. Siegal would reimburse them for the actual costs of production. For example, the Defendants' counsel explained to Mr. Siegal's counsel:

> In the meantime, please confirm that Mr. Siegal will reimburse Farm Fresh for all costs and expenses incurred by Farm Fresh in connection with his inspection and copying of Farm Fresh's books and records as set forth in Section 8.1.2 of the

---

[12] A state law may also raise federal preemption issues under the Bankruptcy Clause and the Supremacy Clause of the U.S. Constitution. U.S. CONST. art. VI, cl. 2; U.S. CONST. art. I, § 8, cl. 4. Preemption may be expressed or implied, with the latter focused on field and conflict preemption. *See, e.g., Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383, 120 L. Ed. 2d 73 (1992) ("Pre-emption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'") (internal citations omitted). "To determine whether a state law is conflict preempted by federal law, the Fourth Circuit has stated that courts should resolve whether it is impossible to comply with both the state and federal law or whether the state law presents an obstacle to the accomplishment of the purposes of the federal law." *Barnhill v. Firstpoint, Inc.*, No. 1:15-cv-892, 2017 WL 2178439, at *4 (M.D.N.C. May 17, 2017). Following the Fourth Circuit's guidance, the Court does not find it necessary to consider conflict preemption based on the particular facts and circumstances of this case. The Court also notes that neither party expressly raised a preemption argument.

[13] Although the Defendants estimated the cost at approximately $2,000.00, the record does not suggest, and Mr. Siegal did not offer any evidence to support, that this estimate was a definitive demand or a final offer with respect to production. *See, e.g., Miles v. Bollinger*, 979 F.2d 848 (4th Cir. 1992) (table case) ("As a general rule, a nonmovant must respond to a motion for summary judgment with affidavits or other verified evidence, rather than relying on his complaint"); *Rolls-Royce PLC v. United Technologies Corp.*, No. 1:10cv457 (LMB/JFA), 2011 WL 1949662, at *10 (E.D. Va. May 20, 2011) (explaining that "the 'mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The emails offered by the Defendants indicate that the estimate was made in response to Mr. Siegal's request for an estimate and that the Defendants' counsel remained open to discussing this amount. Monopolis Declaration, Exs. D–I, ECF 125.

14

> Operating Agreement in accordance with § 4A-406(c) of the LLC Act. Costs and expenses may include, but are not limited to, physical reproduction of documents, bank fees, attorneys fees, and a reasonable hourly rate for any employee time spent locating and identifying the documents. … We will provide an estimate of costs and will expect payment from Mr. Siegal before any documents may be produced.

Email of Nov. 8, 2017, Monopolis Declaration, Ex. E, ECF 125. The evidence further demonstrates that the Defendants provided an estimate of at least $2,000.00 for the production, but were open to a dialogue regarding costs. Mr. Siegal did not make a counter-offer or otherwise indicate a desire to comply with the Operating Agreement. *Id.* at Ex. H. *See also id.* at Exs. D–I. Mr. Siegal's counsel further confirmed that the email evidence in the record represented the parties' entire discussion of the records inspection request. June Hearing Tr. 30, ECF 131. Thus, there is no genuine issue of material fact.

Based on this record, section 8.1.2 of the Operating Agreement, as drafted or as implemented, did not violate the automatic stay; neither did the Defendants' conduct under that provision. Notably, this is not to say that a party's conduct under such a provision could never violate the automatic stay or that such a provision could not be drafted in a way that was invalid. But here, the Defendants asserted their rights under the agreement in a way that neither stripped the estate of an interest nor attempted to control the interest. Bankruptcy law generally does not enlarge a debtor's state law rights, and allowing debtors to use the Code to avoid reasonable obligations under contracts they seek to enforce would distort this general principle. *See, e.g.*, *In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010) ("Importantly, a trustee or debtor in possession cannot assume only the favorable part of a contract and reject the rest—the contract must be assumed or rejected as a whole.") (citing *U.S., Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir. 1990)). *See also In re Bardell*, 374 B.R. 588, 590 (N.D. W.Va. 2007), *aff'd sub nom. Bardell v. Branch Banking & Tr. Co.*, 294 F. App'x 47 (4th Cir.

15

2008) ("'Except for the rights of the bankruptcy trustee to enlarge the bankruptcy estate under 11 U.S.C. §§ 544, *et seq.,* the property interests which pass to the bankruptcy estate are no more extensive than those possessed by the debtor as of the date of filing. Filing bankruptcy cannot revest the debtor with property lost prepetition by foreclosure.'") (internal citations omitted). Accordingly, the Court will grant the Defendants' Dispositive Motions with respect to the records inspection request.[14]

### C.  Threat to Withhold Pay

Subsequent to Mr. Siegal's bankruptcy filing, the parties' relationship appears to have deteriorated. As noted above, Farm Fresh attempted to buy out Mr. Siegal's membership interest. In addition, Mr. Siegal alleges that the Defendants threatened to withhold his pay to force him to sign the Employment Agreement and ultimately terminated his employment with Farm Fresh. The Defendants deny these allegations.

Specifically, the Defendants argue that Mr. Everett never withheld or threatened to withhold Mr. Siegal's pay if he did not sign the Employment Agreement, and therefore no violation of the automatic stay could have occurred on that basis. Mr. Siegal disputes this position and asserts that the Defendants made threats to withhold his pay on at least two occasions—once by email and once during a meeting with Mr. Everett. The email cited by Mr. Siegal is dated May 2, 2017, and states,

> In consultation with corporate legal counsel and relevant state and federal authorities, we are required to have the attached employment contract and IRS form W-4. These forms need to be completed and returned by tomorrow noon. **No further paychecks will be issued until these documents are returned completed**. In addition, all payroll is now processed by our payroll service and will be by direct deposit only. Direct deposits will be made into your account each Friday.

---

[14] The Court notes that Mr. Siegal did eventually receive the documents he was requesting through the discovery process in this adversary proceeding. As a result, the underlying records inspection request is moot.

Siegal Declaration, at ¶¶ 9, 13, Ex. 1 (emphasis in original), ECF 133. The Defendants respond to Mr. Siegal's argument by, among other thing, emphasizing that Mr. Siegal's pay was not *earned* until his customers accepted and paid for the underlying orders.[15] Consequently, according to the Defendants, no stay violation occurred because of this payment policy and the fact that the Defendants never actually withheld Mr. Siegal's pay.

The Defendants' argument overlooks a key aspect of Mr. Siegal's position. Mr. Siegal posits that the *threat* to withhold his pay was a violation of the automatic stay because that action was designed to exercise control over, or remove, property of the estate.[16] Courts generally find threats to take action sufficient to constitute violations of the automatic stay. *See, e.g.*, *In re Robinson*, No. 10-12932-SSM, 2011 WL 832857, at *2 (Bankr. E.D. Va. Mar. 3, 2011) ("The range of prohibited conduct is expansive, ranging from informal conduct like sending letters or making phone calls to formal conduct such as initiating judicial proceedings. . . . Indeed, merely sending bills for prepetition debts, even without threats to sue, has been held to be a violation of the automatic stay. . . .") (internal citations omitted).[17] The fact that Mr. Siegal executed the

---

[15] The Court observes that Maryland wage law focuses on when the *employee* satisfies all conditions precedent to payment. *See, e.g.*, *Blanch v. Chubb & Sons, Inc*., No. CV CCB-12-1965, 2017 WL 4167383, at *3 (D. Md. Sept. 20, 2017) ("Under Maryland law, once an employee 'does everything required to earn the pay,' his right to receive the pay vests and cannot be withheld because employment is terminated prior to the date of payment. *Medex v. McCabe*, 372 Md. 28, 811 A.2d 297, 301, 305 (2002). 'Contractual language between parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts.' *Id*. at 304."). The Court views conditions imposed by a private contract and outside the control of the employee arguably different than actions required of the employee to earn (or at least have an inchoate right to receive) the pay at issue. Nevertheless, because the alleged violation of the automatic stay is grounded in a threat to withhold pay—whenever that pay might be earned—the Court does not need to resolve this issue for purposes of this Memorandum Opinion.

[16] "In the context of [the automatic stay], control is interpreted broadly to include any actions taken postpetition against property of the estate that disrupt the status quo and inhibit the debtor's ability to effectively proceed through the bankruptcy." *Colonial Penniman, LLC v. Williams (In re Colonial Penniman, LLC)*, 575 B.R. 664, 659 (Bankr. E.D. Va. 2017).

[17] *See also In re Heeley*, No. 14-03291-5-DMW, 2014 WL 7012652, at *2 (Bankr. E.D.N.C. Dec. 11, 2014) ("BJ's collected a pre-petition debt by excluding the Debtors from shopping at its store and by the threat of criminal prosecution. A creditor is motivated in making a worthless check referral in whole, or in part, by the hope of getting reimbursed. . . . The referral of the debt to WCP constitutes a willful violation of the stay, and the acceptance of the collected funds ratified that improper action.") (internal citations omitted); *In re Crudup*, 287 B.R. 358, 363 (Bankr. E.D.N.C. 2002) ("The letter clearly states that his efforts will cease if Mr. Crudup pays him the $17,500 he last

Employment Agreement and that the Defendants never actually withheld his pay does nothing to mitigate the alleged stay violation in the first instance. To the contrary, the fact that the alleged threat produced the desired result might support a finding that the automatic stay was violated.

Regardless, the record shows a genuine issue of material fact. The statements in the Siegal Declaration concerning the May 2017 email and Mr. Siegal's meeting with Mr. Everett likely would be admissible at trial under, for example, Evidence Rules 801(d) and 803(6).[18] The statements in the Everett Declarations likely would garner the same treatment. The dispute may require the Court to assess the credibility of the witnesses and weigh this testimony with the other admissible evidence. Given this state of affairs, summary judgment is not warranted and the Court will deny the Dispositive Motions as they relate to the threat to withhold pay.

### D.  Use of Mr. Siegal's Proprietary Information

The Defendants also contest Mr. Siegal's assertion that the Defendants' continued use of his proprietary information, if any, without compensation constitutes a violation of the automatic stay. The Court has reviewed the Non-Disclosure Agreement and the Operating Agreement. The Court was not able to identify any provision in those documents requiring the Defendants to compensate Mr. Siegal for the use of his proprietary information in the ordinary course of

---

offered to accept. This letter violates both purposes behind the automatic stay: it harasses and threatens the debtor, and it seeks to put Mr. Donovan ahead of other creditors in the distribution of assets.").

[18] Evidence Rule 803(d) provides, in relevant part, "A statement that meets the following conditions is not hearsay:
> (2) *An Opposing Party's Statement.* The statement is offered against an opposing party and:
>> (A) was made by the party in an individual or representative capacity . . .

Evidence Rule 803(6) provides an exception to the Rule Against Hearsay defined by Evidence Rule 802, for "Records of a Regularly Conducted Activity," specifically "A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

business.[19] Likewise, the Defendants' right to use the proprietary information does not appear limited to, or restricted by, Mr. Siegal's ongoing employment with Farm Fresh.[20] Rather, the Non-Disclosure Agreement grants Mr. Everett the limited right to use the proprietary information in accordance with the terms of the agreement. Non-Disclosure Agreement § VIII. To the extent that the Defendants have a right under the parties' agreements and applicable nonbankruptcy law to use the proprietary information in the ordinary course of business, their continued use of that information cannot constitute a violation of the automatic stay.[21] Mr. Siegal offered no admissible evidence that the Non-Disclosure Agreement provided otherwise.

In his Declaration, Mr. Siegal points to certain provisions in the Non-Disclosure Agreement that preserve his rights and remedies against Mr. Everett for misuse of the proprietary information under, or contravention of, the Non-Disclosure Agreement. Siegal Declaration ¶¶ 23, 24. The Non-Disclosure Agreement also allows Mr. Siegal to request the return of written proprietary information and verification that Mr. Everett no longer is using that information.

---

[19] Mr. Siegal points to provisions in the Non-Disclosure Agreement that provide for remedies or compensation in the event that Mr. Everett circumvents the terms of the agreement. Siegal Declaration, ¶¶ 23, 24. As explained herein, the Non-Disclosure Agreement on its face does not limit or restrict Mr. Everett's use of proprietary information, other than it implies that the information be used in connection with Farm Fresh. *See, e.g.,* Non-Disclosure Agreement § II.B. Mr. Siegal did not offer any evidence to contradict that, if proprietary information was used by the Defendants, it was used in connection with Farm Fresh. *See supra* note 13 (citing standards for nonmovant refuting properly supported motion for summary judgment). As noted below, this Memorandum Opinion does not address whether Mr. Siegal may be entitled to compensation for use or misuse of his proprietary information.

[20] Mr. Siegal may argue that the continued use of his proprietary information was conditioned on his membership interest in Farm Fresh. The Court is not, by this Memorandum Opinion, addressing whether such a condition exists or, if it does, its potential implications for this matter. Among other things, the status of Mr. Siegal's membership interest in Farm Fresh remains open pending an evidentiary trial in this matter.

[21] A nondebtor licensee may, for example, continue to use the debtor's intellectual property under the terms of the parties' prepetition license agreement pending the debtor's decision to assume or reject the license agreement in the bankruptcy case. 11 U.S.C. § 365. That continued use does not violate the automatic stay—e.g., use generally is not an act to obtain possession of, or control over, an interest of the debtor in property. *See, e.g., United States v. Inslaw*, 932 F.2d 1467, 1472–1474 (D.C. Cir. 1991) (holding, among other things, that the continued use of software rights was not a violation of the automatic stay), *cert. denied*, 112 S. Ct. 913 (1992). *Cf. In re Rupari Holding Corp.*, 573 B.R. 111 (Bankr. D. Del. 2017) (finding cause to annul the automatic stay to permit trademark licensor to terminate prepetition license agreement). Moreover, the nondebtor licensee may be able to continue to use the debtor's intellectual property even if the debtor rejects the license agreement under certain circumstances and if the requirements of section 365(n) of the Code are satisfied. 11 U.S.C. § 365(n).

Non-Disclosure Agreement § V. Mr. Siegal did not, however, offer any evidence of misuse, or a request for return, of the proprietary information.[22]

The Court thus concludes that no genuine issue of material fact exists concerning the Defendants' continued use of Mr. Siegal's proprietary information and the alleged stay violation. The Court will grant that aspect of the Defendants' Dispositive Motions. That said, the Court is not opining in any way regarding the extent or value of Mr. Siegal's proprietary information, whether any such value is integrated into the overall value of Farm Fresh, or whether Mr. Siegal is entitled to a distribution of any such value or the return of any such proprietary information under the terms of the Operating Agreement or the Non-Disclosure Agreement. Such valuation and distribution issues are not before the Court in the context of the Dispositive Motions. Moreover, this Memorandum Opinion does not address any claim by Mr. Siegal that Mr. Everett breached the Non-Disclosure Agreement. The Amended Complaint does not assert a breach of contract or other claim that would implicate such issues.

### E.  Mr. Everett's Personal Liability for Alleged Stay Violations

Regardless of whether violations of the automatic stay occurred, Mr. Everett argues that he cannot be personally liable for those violations because he was acting in his capacity as General Manager of Farm Fresh and is exculpated under the terms of the Operating Agreement.[23] Mr. Siegal responds that the exculpation provision cannot protect an individual from violations

---

[22] Indeed, prior to filing his Declaration, Mr. Siegal never contested the validity of the Operating Agreement or his status as a member of the LLC under that agreement. To the extent the parties were conducting themselves in accordance with the Operating Agreement and the Non-Disclosure Agreement at the time of the alleged stay violations, the Court must evaluate the admissible evidence in that context.

[23] In the Rule 12(c) Order, the Court addressed, in general terms, case law finding that an entity's agents may be subject to personal liability for violations of the automatic stay. Rule 12(c) Order at 10. *See also Michaud v. Ablitt & Caruolo (In re Michaud)*, No. 05-1126-JMD, 2007 WL 135902, *3 (Bankr. D. N.H. Jan. 16, 2007) (observing that "violating the stay as an agent is not a defense to a claim of stay violation"); *Jenkins Brick Co. v. Lowery (In re Lowery)*, No. 10-80071-JAC, 2010 WL 4259947 (Bankr. N.D. Ala. Oct. 21, 2010) (finding that the debtor had a "plausible" claim against business's agent for violating the automatic stay and analogizing such potential liability to an agent's personal liability for torts).

of the automatic stay and that, even if applicable, Mr. Everett's actions were not authorized by the Operating Agreement. The latter assertion would place Mr. Everett's actions outside of the scope of the exculpation provision.

Section 5.5.1 of the Operating Agreement provides

> The General Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the General Manager within the scope of the authority conferred on the General Manager by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement.

Operating Agreement, § 5.5.1. The General Manager, in turn, has broad authority under the Operating Agreement. He is given the "full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to," among other things, enter into contracts, make financing arrangements, operate the business, and take certain actions on behalf of the LLC. *Id.* at § 5.1.4. This kind of delegation of authority is generally consistent with entity law and the Maryland Limited Liability Company Act. *See generally Obeid v. Hogan*, No. 11900-VCL, 2016 WL 3356851, at *5–*6 (Del. Ch. June 10, 2016) (analyzing Delaware limited liability company law, which contains "freedom of contract" principle similar to that under Maryland law, and observing that "'[v]irtually any management structure may be implemented through the company's governing instrument'") (internal citations omitted).

Section 4A-403(a) of the Maryland Limited Liability Act allows parties, by agreement, to vary the voting provisions set forth in the Act. Md. Limited Liability Company Act § 4A-

403(a).[24] The Operating Agreement purports to do exactly that by designating what matters might be undertaken by the LLC through its General Manager and identifying when those actions first require the affirmative vote of members. For example, section 5.1.5 of the Operating Agreement provides, "The General Manager shall have the authority to amend this Agreement pursuant to this Section 5.1.5 *only with the approval of Members holding more than fifty percent (50%)* of the Class A Percentages." Operating Agreement, § 5.1.5 (emphasis added). In addition, the Operating Agreement gives the General Manager authority to make decisions on behalf of the LLC and to approve loans to, or personal services by, any member. *Id.* at §§ 3.3, 5.1.4, 5.3.1. Those provisions of the Operating Agreement do not reference or expressly require member approval. *Id.*

The Court understands that Mr. Siegal now contests the power vested in Mr. Everett as General Manager, but those terms were incorporated into the Operating Agreement executed by the parties. The Court cannot change or alter the terms of that contract, unless otherwise expressly authorized by the Code. *See generally In re Dumas*, 392 B.R. 204, 208 (Bankr. D.S.C. 2008) ("'The mere fact that a party is obliged to go into a federal court of equity to enforce an essentially legal right arising upon a contract valid and unassailable under controlling state law does not authorize that court to modify or ignore the terms of the legal obligation upon the claim, or because the court thinks, that these terms are harsh or oppressive or unreasonable.'") (quoting *Manufacturers' Fin. Co. v. McKey*, 294 U.S. 442, 448–49 (1935)). That said, Maryland courts have recognized some limitations even on broad delegations of authority under non-corporate

---

[24] As one commentator explained, "Although the applicable law [governing LLCs] varies (sometimes significantly) from state to state, most of these rules are default rules. Variation of those rules is invited through private ordering." Joan MacLeod Heminway, *The Ties That Bind: LLC Operating Agreements as Binding Commitments*, 68 SMU L. Rev. 811, 813 (2015). *See also, e.g.*, Md. Limited Liability Company Act § 4A-402(a) ("In general.—Except for the requirement set forth in § 4A-404 of this subtitle that certain consents be in writing, members may enter into an operating agreement to regulate or establish any aspect of the affairs of the limited liability company or the relations of its members …").

entity agreements. *See, e.g., Trasatti v. Trasatti*, No. 109, 2018 WL 2750266, at *14 (Md. Ct. Spec. App. June 7, 2018) ("The General Partners' authority under the Agreement, while broad, was 'subject ... to the other provisions of [the] Agreement,' including the arm's length provision, the duty to use Partnership credit and assets for the benefit of the Partnership, and the duties of loyalty and care under MRUPA. Thus, to the extent the Limited Partners can prove that the General Partners violated those provisions in the exercise of their authority, the actions are not authorized.").

Maryland courts also recognize the enforceability of exculpation clauses in entity governance documents. *See, e.g., BJ's Wholesale Club, Inc. v. Rosen*, 80 A.3d 345, 351 (Md. 2013) ("We have had occasion to address the validity of exculpatory clauses most recently in *Wolf*, determining that '[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause.'") (internal footnote and citations omitted). Such provisions generally encourage qualified individuals to serve entities and to do so in a way that complies with their fiduciary duties and maximizes value for the entities and their owners. Maryland courts will not, however, enforce exculpation clauses to the extent that they: "(1) cover[] extreme forms of negligence; (2) were a result of unequal bargaining power; or, (3) cover[] transactions that affected the public interest." *Rosen*, 80 A.3d at 362 (citing *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994)).[25]

---

[25] In addition, similar to the discussion above concerning record inspection rights, an exculpation clause in a private contract may arguably be void as against public policy depending on the particular facts and circumstances of the case. *See supra* Part III.B and note 12. Any related nonbankruptcy law also may be subject to scrutiny under a preemption analysis if the law conflicts with or impedes a significant objective of the Code. Nevertheless, as in the records inspection context, the Court does not need to resolve these important policy issues, at least at this stage of the litigation, given the facts of this case. *See id.*

The Defendants argue that the exculpation clause contained in the Operating Agreement is valid and that none of the three exceptions to enforceability of such a clause under Maryland law apply in this case. The Court views the matter somewhat differently. In particular, the Court finds that the first exception cited by the Maryland Court of Appeals in *Rosen*—the exception for extreme forms of negligence—might apply in this case, to the extent that Mr. Everett is found to have violated the automatic stay. The Maryland Court of Appeals has explained this first exception as follows, "a party will not be permitted to excuse its liability for intentional harms or for the more extreme forms of negligence, i.e., reckless, wanton, or gross." *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994). A violation of the automatic stay certainly can constitute intentional, reckless, wanton, or grossly negligent conduct. Indeed, some courts characterize a violation of the automatic stay as an intentional tort. *See, e.g.*, *In re Davis*, 177 B.R. 907, 911 (B.A.P. 9th Cir. 1995) (observing in different context that a "[w]illful violation of the automatic stay is an intentional tort for which compensatory and punitive damages may be awarded.").

At the June Hearing, the Defendants argued that, at most, the Defendants' violations of the automatic stay, if any, were willful. June Hearing Tr. 40–42. The Defendants presumably took this position because section 362(k) of the Code speaks to remedies for "willful" violations of the automatic stay, which courts have defined as existing where a party knows about the bankruptcy case and acts deliberately. 11 U.S.C. § 362(k). *See also, e.g.*, *In re Seaton*, 462 B.R. 582, 592 (Bankr. E.D. Va. 2011) ("[T]he conduct of a creditor in violating the stay is willful when '[t]here is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to [continue collection procedures] in spite of it.'") (quoting *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292–93 (4th Cir. 1986)). The Court is not aware of any authority that precludes intentional, reckless, wanton, or

grossly negligent conduct from also constituting willful conduct for purposes of section 362(k). Moreover, the Court observes that the definition of willful itself for purposes of section 362(k) may, standing alone, constitute intentional, reckless, wanton, or grossly negligent conduct.

Based on the foregoing, the Court concludes that a violation of the automatic stay may fall within one of the three exceptions to the enforcement of exculpation clauses recognized by Maryland courts. Because genuine issues of material facts exist regarding certain of the alleged violations of the automatic stay, resolution of the issue on summary judgment is not appropriate. The Court will deny the aspects of the Defendants' Dispositive Motions that relate to Mr. Everett's personal liability for alleged violations of the automatic stay.

### F.  Farm Fresh's Alleged Violation of Section 525(b)

The final issue raised by the Defendants' Dispositive Motions concerns Mr. Siegal's claim against Farm Fresh under section 525(b) of the Code.[26] Section 525(b) of the Code provides,

> **(b)** No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—
>> **(1)** is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;
>> **(2)** has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or
>> **(3)** has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(b). Courts generally limit claims under section 525 of the Code to the strict language of the statute, both in terms of who constitutes an employer or employee and whether any adverse action against the employee was solely because of the bankruptcy filing. *See, e.g.,*

---

[26] Mr. Siegal brought claims against both Defendants under section 525(b). By the Rule 12(c) Order, the Court determined that Mr. Everett was not an "employer" for purposes of section 525(b) of the Code and granted judgment on the pleadings as to that claim against Mr. Everett. *See* Rule 12(c) Order at 6–9.

*Rea v. Federated Investors*, 627 F.3d 937 (3d Cir. 2010) (whether section 525(b) applies to hiring decisions); *Fiorani v. CACI*, 192 B.R. 401 (E.D. Va. 1996) (whether temporary worker is protected under section 525); *Davis v. Long Reach Federal Credit Union, (In re Davis)*, No. 16-ap-30, 2017 WL 3279159, at *3 (Bankr. N.D. W.Va. Aug. 1, 2017) (discussing requirement that the decision be based solely on the debtor's bankruptcy). With respect to the latter, the court in *Davis* explained that "[e]ven if a prima facie case of discrimination is established, § 525 is not violated upon the employer providing a separate reason for the termination, unless the reason is shown to be pretextual . . ." *Davis*, 2017 WL 3279159, at *3.

In his Declaration, Mr. Everett states that Farm Fresh's termination of Mr. Siegal was based primarily on Mr. Siegal's efforts to form a business to compete with Farm Fresh.[27] Everett Declaration at ¶ 11, ECF 124. Mr. Siegal disputes this allegation. He also suggests that, even if true, the Operating Agreement permits members to participate in competitive businesses. The Court notes that it is unclear whether the Operating Agreement provision referenced by Mr. Siegal applies to employees as well as members.[28]

Regardless, the Court finds a genuine issue of material fact concerning the reasons underlying Farm Fresh's termination of Mr. Siegal. Mr. Siegal has disputed, among other things, his involvement in a competitive business, and that testimony would be based on his personal

---

[27] In its pleadings, Farm Fresh also argued that the termination of Mr. Siegal could not violate section 525(b) of the Code because Mr. Siegal is an at-will employee. Farm Fresh did not offer any authority to support this position, and, as explained in the Rule 12(c) Order, the Court finds several problems with it. Rule 12(c) Order at n. 7, ECF 119. For example, excluding at-will employees from the protections of section 525(b) of the Code would make that relief unavailable to a large number of debtors, as at-will employment relationships are a common form of employment. Second, an at-will employment relationship means only that the neither party needs a reason or cause to end the relationship. It does not preclude a finding that an employer terminated an employee for a reason, including a bankruptcy filing.

[28] Section 5.4.2 of the Operating Agreement provides,

    Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of the General Manager or any Member to conduct any other business or activity whatsoever, and the Member or General Manager shall not be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business.

Operating Agreement, § 5.4.2.

knowledge and likely admissible at trial. The Court will have to assess and weigh this testimony with that of Mr. Everett and any other evidence produced by the Defendants in support of their reasons for terminating Mr. Siegal. These kinds of factual disputes are best decided by live testimony and not by affidavit or declaration. As such, the Court will deny the aspects of the Defendants' Dispositive Motions relating to Farm Fresh's liability under section 525(b) of the Code.

## IV.    Conclusion

For the reasons set forth above, the Court concludes that the Defendants' Dispositive Motions should be granted solely with respect to: (i) the Defendants' request that Mr. Siegal pay the costs associated with his records inspection request; and (ii) the Defendants' use, if any, of Mr. Siegal's proprietary information without compensation. The Court will deny all other relief requested by the Defendants' Dispositive Motions and deny Mr. Siegal's Dispositive Motion. The Court will enter a separate order consistent with, and granting the relief set forth in, this Memorandum Opinion.

Copies to:

Debtor's Counsel
Defendants' Counsel
Chapter 13 Trustee

**END OF MEMORANDUM OPINION**